IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

VERTICALNET, INC.              :        CIVIL ACTION
                              :
         v.                   :
                              :
U.S. SPECIALTY INSURANCE CO.   :        NO. 06-4245

MEMORANDUM

Dalzell, J.                                      May 21, 2007

       Verticalnet, Inc. here sues its former insurer, U.S.
Speciality Insurance Co., for coverage on an underlying lawsuit.
Before us now are the parties' cross-motions for summary judgment
as to the first count of Verticalnet's three count complaint.

## I.  Facts

### A.   The Insurance Policy

       Verticalnet, Inc. purchased from U.S. Specialty
Insurance Co. a Directors, Officers and Corporate Liability
Insurance Policy (the "Policy"), effective from February 11, 2004
to February 11, 2005.  Jt. Stip. of Facts ("Stip.") ¶ 2, Ex. F
Policy.  In relevant part, the Policy provides that:

> (A)  The Insurer will pay to or on behalf of
>      the Insured Persons Loss arising from
>      Claims first made during the Policy
>      Period . . ., against the Insured
>      Persons for Wrongful Acts, except when
>      and to the extent that the Company has
>      paid such Loss to or on behalf of the
>      Insured Persons as indemnification or
>      advancement.

> (B)   The Insurer will pay to or on behalf of
>       the Company Loss arising from:
>
>       (1)   Claims first made during the Policy
>             Period . . . against the Insured
>             Persons for Wrongful acts, if the
>             Company has paid such Loss to or on
>             behalf of the Insured Persons as
>             indemnification or advancement,
>             and/or
>
>       (2)   Securities Claims first made during the
>             Policy Period . . . against the Company
>             for Wrongful Acts.

Policy at 2.

The Policy defines certain relevant terms, including

"Loss" and "Securities Claim":

> (G)   Loss means Defense Costs and any
>       damages, settlements, judgments or other
>       amounts . . . that:
>
>       (1)   an Insured Person is legally
>             obligated to pay as a result of any
>             Claim, or
>
>       (2)   the Company is legally obligated to
>             pay as a result of any Securities
>             Claim;
>
> provided, that Loss will not include wages,
> fines, taxes or penalties or matters which
> are uninsurable under the law pursuant to
> which this Policy is construed. . . .
>
> . . .
>
> (N)   Securities Claim means a Claim which:

2

      (1)    is brought by or on behalf of one
or more securities holders of the
Company in their capacity as such,
or

      (2)    arises from the purchase or sale
of, or offer to purchase or sell,
any securities issued by the
Company, whether such purchase,
sale or offer involves a
transaction with the Company or
occurs in the open market.

Id. at 3-4.

The policy also has an "EXCLUSIONS" section with nine subsections specifying types of claims that the policy does not cover.  Id. at 4-5; see also id. at Endorsement No. 2 (replacing Exclusion (I)).  This section does not contain an exclusion for claims or damages arising from a breach of contract.

    **B.**    **The Underlying Litigation**

On September 21, 2004, Jodek Charitable Trust, on its own behalf and as an assignee of and successor in interest to other parties[1] (collectively, the "Jodek parties"), sued Verticalnet and four other defendants[2] in Jodek Charitable Trust,

---

[1] These parties are Zvi Schreiber, Wyoma Investments, K.F.G. Trust, and Schreiber, LLC.  Jodek Am. Compl. ¶¶ 17-21.

[2] The other defendants are American Stock Transfer and Trust Company ("ASTT"), Mark L. Walsh, Douglas Alexander, and
                                       (continued...)

R.A. v. Verticalnet, Inc., No. 04-4455 (E.D. Pa.), then amended the complaint on October 5, 2004.  Stip. ¶¶ 3-4, Exs. G, H.  The dispute concerned Verticalnet stock that certain Jodek parties acquired as a result of a 2000 merger between Verticalnet and Tradeum, Inc., an entity controlled by a Jodek party.  The contracts governing the merger included a Merger Agreement, an Amended Merger Agreement, a Registration Rights Agreement, an Escrow Agreement, and a Lock-Up Agreement.  Id. at ¶ 1, Exs. A-E.

The Registration Rights Agreement required Verticalnet to "[act] . . . promptly, and in no event later than the third business day after [filing of Form 10K] . . . use reasonable commercial efforts to cause the S-3 Registration Statement to become effective as promptly as practicable."  Jodek Am. Compl. ¶ 37(iv) (quoting Registration Rights Agreement § 2(a)).  When Jodek's assignors first tried to divest themselves of certain merger stock, allegedly they could not do so because Verticalnet had failed to issue share certificates and cause a Form S-3 Registration Statement to be filed and become effective.  Id. at ¶¶ 48-49.  The assignors are said to have repeatedly demanded that Verticalnet issue the share certificates and file the

_____

² (...continued)
James McKenzie, Esquire.  Jodek Am. Compl. ¶¶ 26-29.

registrations, which Verticalnet did after a two month delay.
Id. at ¶¶ 50, 53.  The plaintiffs alleged that because of
defendants' "failure to act and/or their negligence in failing to
timely perform a series of contractually promised acts, or
legally required acts, or delaying the performance of such acts,"
plaintiffs did not receive and sell certain Verticalnet stock in
a timely fashion.  Id. at ¶ 1.  The plaintiffs claimed they
suffered damages because the stock price fell during the delays
that the defendants caused.  Id. at ¶¶ 48-58.

On November 3, 2004, U.S. Specialty, through counsel,
sent a letter to Verticalnet's insurance broker setting forth the
insurer's preliminary position as to coverage for the Jodek
action, as well as a reservation of rights.  Stip. ¶ 5, Ex. I
U.S. Specialty Letter of Nov. 3, 2004.  The letter noted that
"Loss" does not include "matters which are uninsurable under the
law," so, citing to Pennsylvania law, the insurer contended that
the Policy does not cover Verticalnet's contractual obligations.
U.S. Specialty Letter, at 5.  Verticalnet, through counsel,
replied by letter the following month, stating, inter alia, that
the Policy covered all claims in the Jodek action.  Stip. ¶ 6,
Ex. J Verticalnet Letter of Dec. 22, 2004, at 3-4.

On January 26, 2006, the court presiding over the Jodek action dismissed seven of the ten counts.  Stip. ¶ 7, Ex. K Jodek Mem. & Order, Jan. 26, 2006.  Two claims remained against Verticalnet,[3] breach of contract and violation of the Uniform Commercial Code ("U.C.C.").[4]  The breach of contract claim alleged that Verticalnet breached the original Merger Agreement, Amended Merger Agreement, Lock Up Agreement, Escrow Agreement and Registration Rights Agreement by failing to "timely and properly issue the share certificates, cause their registration with the filing of an appropriate registration statement, and/or register the transfer of the shares of the Merger Stock."  Jodek Am. Compl. ¶¶ 93-94.  The U.C.C. claim alleged that "[b]y wrongfully and/or negligently refusing to register or by simply failing to so register the Merger Stock after the Plaintiff's assignor's requests," Verticalnet violated U.C.C. Section 8-401(a), codified at 13 Pa.C.S.A. § 8401(a).[5]  See id. at ¶ 142.

---

[3] The third surviving claim was only against defendant ASTT, which is neither an insured nor a party here.

[4] The Jodek parties brought the U.C.C. claim against Verticalnet and ASTT, but our focus is solely on Verticalnet's alleged actions.

[5] Section 8-401(a) provides that "[i]f a certificated security in registered form is presented to an issuer with a
(continued...)

On February 21, 2006, Jodek and Verticalnet each lodged a settlement memorandum with the court.  Stip. ¶¶ 8-9.  On February 27, and June 27, 2006, a magistrate judge held settlement conferences that representatives from Verticalnet, Jodek, and U.S. Specialty attended.  Id. at ¶¶ 10, 16.  At the June 27, 2006 settlement conference, Jodek agreed to settle the case for $5,563,000, funded in part by any unspent amount of Verticalnet's applicable $500,000 self-insured retention, with the remaining funds consisting of alleged insurance proceeds that Verticalnet would attempt to obtain from U.S. Specialty.  Id. at ¶ 17.  U.S. Specialty's representative objected to the settlement during the conference.  Id. at ¶ 18.  On August 22, 2006, the court entered an order that approved the settlement and dismissed the Jodek case with prejudice.  Id. at ¶ 19.

### C.   **This Litigation**

On September 22, 2006, Verticalnet filed this action. The complaint seeks a declaratory judgment that U.S. Specialty has a duty to pay Verticalnet the settlement funds agreed to by

---

[5] (...continued)
request to register transfer or an instruction is presented to an issuer with a request to register transfer of an uncertificated security, the issuer shall register the transfer as requested" if certain conditions are satisfied.  13 Pa.C.S.A. § 8401(a).

Verticalnet and Jodek (Count I), and also states counts for
breach of contract (Count II) and bad faith pursuant to 42
Pa.C.S. § 8371 (Count III).  To resolve the coverage issue, we
ordered the parties to file cross-motions for summary judgment as
to Count I[6] and a joint stipulation of facts, which they have
done.  We now consider their motions and responses to those
motions.

## II.  <u>Analysis</u>[7]

### A.  <u>Legal Standard</u>

Summary judgment is appropriate if there is no genuine
issue of material fact and the moving party is entitled to
judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In ruling
on a motion for summary judgment, the Court must view the
evidence, and make all reasonable inferences from the evidence,
in the light most favorable to the nonmoving party.  <u>Anderson v.</u>

---

[6] "In a case of actual controversy within its
jurisdiction . . . any court of the United States, upon the
filing of an appropriate pleading, may declare the rights and
other legal relations of any interested party seeking such
declaration, whether or not further relief is or could be
sought."  28 U.S.C. § 2201(a).

[7] In this diversity action, the parties agree that
Pennsylvania law applies, and we, too, find that Pennsylvania law
governs here.

Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  The moving party bears the initial burden of proving that there is no genuine issue of material fact in dispute.  Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585 n.10 (1986).  Once the moving party carries this burden, the nonmoving party must "come forward with 'specific facts showing there is a genuine issue for trial.'"  Id. at 587 (quoting Fed. R. Civ. P. 56(e)). The task for the Court is to inquire "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  Liberty Lobby, 477 U.S. at 251-52; Tabas v. Tabas, 47 F.3d 1280, 1287 (3d Cir. 1995) (en banc).

### B.    U.S. Specialty's Motion for Summary Judgment

The parties agree that the Jodek action qualifies as both a "Securities Claim" and a "Claim" as defined in the Policy. The Policy does not contain an exclusion for breach of contract claims.  Verticalnet therefore asserts that the Policy covers its claim for the Jodek action.  U.S. Specialty denies this, contending that Pennsylvania's public policy bars coverage for breaches of contract, which, according to U.S. Specialty, both of Jodek's claims are.  Before turning to the public policy

9

question, we set forth the standard under which we evaluate
insurance contracts.

### 1.   __Interpretation of Insurance Contracts__

Under Pennsylvania law, the interpretation of an
insurance contract is a question of law for the court to decide.
Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997).
Thus, on a summary judgment motion a court can determine, as a
matter of law, whether a claim is within a policy's coverage or
is barred by an exclusion.  Butterfield v. Giuntoli, 670 A.2d
646, 651 (Pa. Super. Ct. 1995).  Courts interpret coverage
clauses broadly "to afford the greatest possible protection to
the insured," and, accordingly, they interpret exceptions to an
insurer's general liability narrowly against the insurer.
Westport Ins. Corp. v. Bayer, 284 F.3d 489, 498 n.7 (3d Cir.
2002) (quoting Eichelberger v. Warner, 434 A.2d 747, 750 (Pa.
Super. Ct. 1981)).  The insured bears the burden of proving facts
that bring its claim within the policy's coverage, but the
insurer bears the burden of proving that any exclusions or
limitations on coverage apply, because disclaiming coverage on
the basis of an exclusion is an affirmative defense.  Koppers
Co., Inc. v. Aetna Cas. and Sur. Co., 98 F.3d 1440, 1446 (3d Cir.

1996) (applying Pennsylvania law).

Where the policy's language is clear and unambiguous, courts give effect to that language.  Standard Venetian Blind Co. v. American Empire Ins. Co., 469 A.2d 563, 566 (Pa. 1983).  But where a policy provision is ambiguous, courts construe it in favor of the insured and against the insurer, the drafter of the agreement.  Id.  Ambiguity exists if contractual language "is reasonably susceptible of different constructions and capable of being understood in more than one sense."  Madison Const. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 106 (Pa. 1999) (internal citation and quotation omitted).  Courts do not resolve the question of ambiguity in a vacuum, but instead consider whether the policy language is subject to more than one reasonable interpretation when applied to a given set of facts. Id.

## 2.  **Public Policy**

U.S. Specialty contends that the Policy does not cover Verticalnet's claim because the Policy only pays for a "Loss arising from Claims" and this claim does not satisfy the definition of "Loss."  Under the Policy, "Loss [does] not include . . . matters which are uninsurable under the law pursuant to

11

which the Policy is construed," and U.S. Specialty contends that Pennsylvania public policy bars liability coverage for contractual breaches, thereby rendering Verticalnet's claim "uninsurable" under Pennsylvania law.  Accordingly, we must decide whether, in the absence of a policy exclusion for contract-based claims, Pennsylvania public policy prohibits U.S. Specialty from insuring a securities claim that arises from a contractual duty.  As an initial matter, we note that overriding unambiguous contractual terms on the basis of public policy requires that the putative public policy be clearly established. See Hall v. Amica Mut. Ins. Co., 648 A.2d 755, 760 (Pa. 1994).[8]

---

[8] The bar is thus set rather high for U.S. Specialty's theory here:

> Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest.  As the term "public policy" is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy. . . . Only dominant public policy would justify such action.  In the absence of a plain indication of that policy through long governmental practice or statutory enactments, or of violations of obvious ethical or moral standards, the Court should not assume to declare contracts . . . contrary to public policy.

(continued...)

U.S. Specialty's public policy argument relies on decisions under Pennsylvania law upholding insurers' denial of coverage for breach of contract claims under general liability policies.  See Keystone Filler & Mfg. Co., Inc. v. American Mining Ins. Co., 179 F. Supp. 2d 432 (M.D. Pa. 2002); Redevelopment Auth. of Cambria County v. Int'l Ins. Co., 685 A.2d 581 (Pa. Super. Ct. 1996) (en banc); see also Augenblick v. Nationwide Ins. Co., No. 99-3419, 1999 WL 975118 (E.D. Pa. Oct. 8, 1999).[9]  General liability policies provide the insured coverage for personal injury or property damage resulting from an "occurrence," and are intended "to protect the insured from liability for essentially accidental injury to the person or property of another rather than coverage for disputes between parties to a contractual undertaking."  Redevelopment Auth., 685 A.2d at 589; see also Keystone Filler, 179 F.Supp.2d at 439 ("The policy defines an 'occurrence' as 'an accident, including

_____

[8] (...continued)
Hall v. Amica Mut. Ins. Co., 648 A.2d 755, 760 (Pa. 1994) (quoting Muschany v. United States, 324 U.S. 49, 66-67 (1945) (footnotes and citations omitted)).

[9] U.S. Specialty also cites to Penn's Market I v. Harleysville Ins. Co., 2005 No. 000557, 2006 WL 1235978 (Pa. Com. Pl. Ct. May 3, 2006), but the Pennsylvania Superior Court reversed that order on April 3, 2007, No. 1442 EDA 2006, after U.S. Specialty filed its briefs.

continuous or repeated exposure to substantially the same general harmful conditions.'"); Augenblick, 1999 WL 975118, at *2 ("An 'occurrence' is defined as 'bodily injury or property damage resulting from an accident, including continuous or repeated exposure to the same general condition.'").  The courts in these cases found that the insureds were not entitled to coverage because their underlying breaches of contract were not an "occurrence" or "accident."  Redevelopment Auth., 685 A.2d at 589 (holding insurer had no duty to defend or indemnify the insured "since the underlying suit arises out of a breach of contract which is not an accident or occurrence contemplated or covered by the provisions of a general liability insurance policy"); Keystone Filler, 179 F. Supp. 2d at 440 ("The rule in Redevelopment Authority -- that there is no "occurrence" if the underlying claim is one merely for breach-of-contract -- has been followed by numerous state and federal courts sitting in Pennsylvania.") (citing cases); Augenblick, 1999 WL 975118, at *2, 5 (holding insurer did not have to cover insured for a breach of contract because it was not an accident).

In contrast to those cases, U.S. Specialty's Directors, Officers and Corporate Liability Policy does not simply protect against an "occurrence":  it expressly provides insurance for

14

securities claims without limiting coverage of such claims to those that do not arise from breaches of contract.  None of the courts that U.S. Specialty cites addresses whether an expressly covered claim -- such as a securities claim -- is uninsurable because it is <u>also</u> contractually based.  Nor do any of these courts base their decisions on "public policy" or any cognate of that term.  Instead, they simply applied the plain meaning of the general liability policies' terms.  These cases thus do not support the claim that Pennsylvania's public policy forbids all liability policies from covering contract-based claims.

U.S. Specialty also identifies "several public policy rationales supporting the generally-accepted notion that liability insurance does not cover breaches of contract."  Def.'s Mem. in Supp. of Mot. for Summ. J. 15.  First, it contends that coverage for contractual liability would convert the insurer into "a sort of silent business partner" or a "guarantor[] or bonder[] of transactions."  <u>Id.</u> at 15-16.  Notably, the cases upon which it chiefly relies for this "notion" involve liability policies with <u>express exclusions</u> for contractually based claims, which the courts applied to preclude coverage, without relying on "public policy."  <u>See</u> <u>Jerry Davis, Inc. v. Maryland Ins. Co.</u>, 38 F. Supp. 2d 387, 390 (E.D. Pa. 1999) (commercial general liability policy

15

excluded damages arising from "delay or failure . . . to perform
a contract or agreement in accordance with its terms); Snyder
Heating Co., Inc. v. Pennsylvania Mfrs. Ass'n Ins. Co., 715 A.2d
483, 485 (Pa. Super. Ct. 1998) (commercial general liability
policy precluded coverage where "the insured is obligated to pay
damages by reason of the assumption of liability in a contract or
agreement"); Phico Ins. Co. v. Presbyterian Med. Servs. Corp.,
663 A.2d 753, 756 (Pa. Super. Ct. 1995) (comprehensive liability
policy excluded "coverage for claims arising in connection with
the breach of oral and written agreements unless they relate,
among other things, to the employment of persons rendering
professional health care services").[10, 11]  The insurers in these
cases apparently recognized problems with insuring losses arising
from contractual claims, so they protected their interests by

---

[10]  The courts in Snyder and Jerry Davis also relied on
the reasoning in Redevelopment Authority.  See Snyder, 715 A.2d
at 485-86; Jerry Davis, 38 F. Supp. 2d at 390.

[11] U.S. Specialty also cites to Berg Chilling Systems
v. Hull Corp., 2002 WL 1833351 (E.D. Pa. May 2, 2002), rev'd on
other grounds, 70 Fed. Appx. 620, 623 (3d Cir. July 11, 2003),
for the proposition that "allow[ing] coverage for breach-of-
contract claims would unfairly render the insurer a party to a
contract made by its insured," id. at *2.  However, in that case
there was "no dispute that [the] strictly contract claim does not
constitute an 'occurrence' such as to trigger coverage under the
Policy."  Id. at *1.

drafting policies with exclusions for contract-based claims. U.S. Specialty chose not to include such a provision -- yet it asks us to craft relief because courts held for other insurers who drafted exclusions that U.S. Specialty did not write.

We also note that the contract exclusion in Phico "preclude[d] coverage for claims arising in connection with the breach of oral and written agreements unless they relate, among other things, to the employment of persons rendering professional health care services." 663 A.2d at 756 (emphasis added). In other words, that insurer agreed to cover some types of contract claims. While that part of the exclusion was not the disputed issue in Phico, the Pennsylvania Superior Court made no mention of it as (somehow) violating public policy. In fact, the Superior Court implicitly endorsed the provision when it explained that the contractual relationship at issue "did not relate to the employment of a person for the provision of health care services, [so] any determination as to the applicability of the policy exclusion" turned on whether the claims sounded in tort or contract. Id. at 756. That court's apparent acceptance of insurance for some contractual claims undercuts U.S. Specialty's position that all such claims are uninsurable.

17

The second rationale that U.S. Specialty points to is the difficulty of underwriting insurance for contractual breaches because insurers would have no way to determine the likelihood that an insured would enter into a contract and then fail to honor it.  See Oak Park Calabasas Condominium Assn. v. State Farm Fire and Cas. Co., 40 Cal. Rptr. 3d 263, 268 (Cal. App. 2 Dist. 2006) ("It would be literally impossible, from an actuarial standpoint, to set appropriate premiums to guard against the risk that an association would enter into multimillion-dollar construction contracts, and then not pay for the construction work.").  Third, U.S. Speciality also identifies a "moral hazard" problem with such coverage because it could encourage insureds to abandon their contractual duties.  As one court aptly described the problem:

> Allowing an insured to control whether it
> will be covered for its act of breaching a
> contract places the insured in the unique
> posture of voluntarily choosing to do some
> act for which he knows an insurance company
> will compensate him even if he chooses
> wrongly.  Who wouldn't buy insurance if he
> could decide whether to perform or decline to
> perform some act which would give him
> coverage for that action?  Such a premise
> eliminates all risk to a potential insured.

18

<u>Waste Corp. of America, Inc. v. Genesis Ins. Co.</u>, 382 F. Supp. 2d
1349, 1354-55 (S.D. Fl. 2005), <u>aff'd</u>, 209 Fed. Appx. 899 (11th
Cir. Dec. 6, 2006) (per curiam).

We by no means belittle the underwriting and moral
hazard problems.  Whether these concerns mean that a public
policy exists against insuring <u>all</u> contract-based claims in
Pennsylvania is quite another question.  If the problems U.S.
Specialty identifies controlled the outcome of Pennsylvania
cases, we would expect that at least <u>some</u> Pennsylvania court
would have mentioned these rationales to announce a public policy
against coverage for breach of contract claims.  But U.S.
Specialty has not identified any such case.

We, too, have found no case where the Pennsylvania
Supreme Court or one of the Commonwealth's appellate courts has
declared a public policy that bars insurance coverage for a
claim, particularly a securities claim, arising from a breach of
contract.  Thus, U.S. Specialty effectively asks us to
extrapolate from general liability insurance cases -- where
courts construing "occurrence" and "accident" held such language
not to cover breaches of contract or that policy exclusions can
bar coverage for such claims -- a sweeping public policy that
liability insurance of <u>any</u> type cannot cover otherwise valid

claims if they also arise from a breach of contractual duty.   In light of the Pennsylvania Supreme Court's strict standards in <u>Hall v. Amica Mutual</u>, <u>supra</u>, we cannot expand the Commonwealth's jurisprudence to create such a public policy.[12]   A federal court most assuredly may not do so in the constrained exercise of its <u>Erie</u> duties.[13]

In the absence of a public policy barring coverage here, we return to the plain terms of the Policy.   As the jurisprudence discussed <u>supra</u> requires, <u>see</u> II.B.1., we construe any contractual ambiguities against the insurer and in favor of the insured, and we interpret coverage clauses broadly to extend

---

[12] Because we reject U.S. Specialty's interpretation of Pennsylvania public policy, we do not reach its argument concerning the U.C.C. claim, namely that the U.C.C. claim is in essence an uninsurable contract claim that Jodek recast in U.C.C. language.

[13] In making our <u>Erie</u>-mandated predictions of state law, we must find some basis in <u>existing</u> state appellate jurisprudence to opine with some modicum of confidence on what (here) the Pennsylvania Supreme Court would likely do.   When there is no controlling state supreme court precedent, this is perilous business indeed.   <u>See</u> Dolores K. Sloviter, <u>A Federal Judge Views Diversity Jurisdiction Through the Lens of Federalism</u>, 78 Va. L. Rev. 1671, 1679-81 n.53 (1992), where Judge Sloviter discusses the difficulty of making "<u>Erie</u> guesses", and cites specific cases where federal predictions of state supreme courts' rulings proved wrong.   By contrast, a panel of the Pennsylvania Superior Court is free tomorrow to adopt the public policy U.S. Specialty urges with much force here.   Under <u>Erie</u>, however, we have no such freedom.

the greatest protection to the insured.  As already noted, the parties agree that Verticalnet presented a "Securities Claim" and a "Claim."  U.S. Speciality has not identified any policy exclusion or any other reason -- aside from its public policy argument -- that would bar coverage of this claim.  We therefore hold that the Policy covers the claim at issue, and deny U.S. Specialty's summary judgment motion.

### C.  **Verticalnet's Motion for Summary Judgment**

For the reasons discussed above, we shall grant Verticalnet's motion for summary judgment insofar as we hold that the Policy covers Verticalnet's claim.  However, we must deny the motion to the extent that it seeks a monetary judgment now.  By limiting the summary judgment motions to Count I, we sought to resolve the coverage issue, which we have now done.  But this does not decide whether Verticalnet is entitled to the entire sum of the settlement because we have not yet found whether the Jodek settlement was reasonable and reached in good faith.  See Alfiero v. Berks Mut. Leasing Co., 500 A.2d 169, 172 (Pa. Super. Ct. 1985) (finding that insured could negotiate a settlement "so long as it was done in good faith and . . . was fair and reasonable").  The parties, who vigorously dispute whether the settlement was either reasonable or reached in good faith, have yet to conduct

21

discovery on that issue.  We shall now allow them discovery on those subjects, as well as on the claims for breach of contract and bad faith.[14]

## III.  <u>Conclusion</u>

Because Pennsylvania's jurisprudence does not support the expansive reading of public policy that U.S. Specialty advances, we hold that the Policy covers the claim at issue.  For the reasons discussed herein, we shall deny U.S. Specialty's motion for summary judgment, and grant in part and deny in part Verticalnet's motion for summary judgment.  An appropriate Order follows.

---

[14] We must also deny the portion of the motion seeking a fixed sum because Verticalnet's attempt to gain judgment on this point is manifestly insufficient.  Verticalnet's brief includes a two-page section asserting that the settlement, resulting from an arms-length negotiation, was reasonable and arrived at in good faith.  <u>See</u> Pl.'s Mem. in Supp. of Mot. for Summ. J. 11-12.  It asserts facts without citing to the record and fails to cite the applicable legal standard.  These failures alone defeat the motion, but we also note that U.S. Specialty submitted an affidavit refuting Verticalnet's assertions.  <u>See</u> Def.'s Resp. in Opp'n to Pl.'s Mot. for Summ. J., Ex. A Vitrano Aff., Mar. 26, 2007.  Verticalnet, as the moving party, plainly failed to satisfy its "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (internal quotations omitted).

BY THE COURT:


/s/ Stewart Dalzell, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

VERTICALNET, INC.          :        CIVIL ACTION
                           :
        v.                 :
                           :
U.S. SPECIALTY INSURANCE CO.  :        NO. 06-4245

<u>ORDER</u>

AND NOW, this 21st day of May, 2007, upon consideration of U.S. Specialty Insurance Co.'s motion for summary judgment as to Count I (docket entry # 17), Verticalnet, Inc.'s motion for summary judgment as to Count I (docket entry # 19), each party's responses to the other's motion, and the parties' joint stipulation of facts (docket entry # 18), and in accordance with the accompanying Memorandum, it is hereby ORDERED that:

1.   U.S. Specialty's motion for summary judgment is DENIED;

2.   Verticalnet, Inc.'s motion for summary judgment is GRANTED IN PART and DENIED IN PART;

3.   By May 25, 2007, the parties shall jointly REPORT BY FAX (215-580-2156) as to whether they believe a mediation with the Honorable Jacob P. Hart would be productive at this time;

4.   By July 9, 2007, the parties shall COMPLETE all remaining discovery; and

      5.   By July 23, 2007, the parties shall SUBMIT any summary judgment motions as to the remaining issues, with responses due August 6, 2007.

                BY THE COURT:


                /s/ Stewart Dalzell, J.